IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SHERRY L. PICKENS, | ) | Case No. 4:06CV3273 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MILLARD LUMBER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Sherry L. Pickens ("Pickens") is a black man.  Knowing that Pickens had done time in prison, Millard Lumber, Inc., ("Millard") hired him.  Pickens got into a dispute with two white coworkers.  The company had a written policy that reserved the right to fire employees without warning if they made threats.  The plaintiff was aware of the "strictness" of the policy.  After concluding that the plaintiff had spoken in a threatening manner, Millard fired him.  As for the white employees, Millard disciplined them, but did not fire them, concluding that they had made no threats.

Claiming that he was fired because of his race, and, belatedly, that his employer did not pay him equally because he was black, Pickens brought this action.  Millard filed a motion for summary judgment.  The motion for summary judgment will be granted.

## I.  BACKGROUND

The material undisputed facts are these:

1.      Plaintiff is an African-American male citizen of the United States and was at all times relevant to this action a resident of Lincoln, Lancaster County, Nebraska.  (Filings 1 & 3, Complaint & Answer ¶ 5.)

2.      Plaintiff was employed by Millard Lumber from March 29, 2004, through December 22, 2005.  (*Id.* ¶ 5.)

3.      Defendant is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq*. (*Id.* ¶ 7.)

4.      On or about February 15, 2006, Plaintiff filed a Charge of Discrimination with the Nebraska Equal Opportunity Commission ("NEOC") and the federal Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of race and color relating only to his termination from employment with Millard Lumber. (*Id.* ¶ 8.)

5.      Plaintiff's Charge of Discrimination relating to the issue of termination was timely filed with the NEOC and EEOC.  (*Id.* ¶ 9.)

6.      Plaintiff's Charge of Discrimination did not contain, nor did it otherwise raise, any allegations or issues relating to pay discrimination.  (Ex. 1, Depo. Plaintiff at 60:3-6; Ex. 2.)[1]

7.      Following an investigation, the NEOC found no cause to believe that discrimination had occurred with regard to the termination and the "Determination" made no mention of pay discrimination.  (Ex. 1, Depo. Plaintiff at 56:3-19; Ex. 5.)

---

[1]Except as otherwise indicated, the exhibits referenced in the text of this memorandum and order may be found  in the defendant's evidence index, Filing 26, and are labeled as "SJ Exhibit."

*Facts Relating to Firing*

8.      After his release from the Nebraska State Penitentiary, Plaintiff was placed on work release and was hired by the defendant in March of 2004.  Plaintiff had heard about Millard through the work-release center.  (Ex. 1, Depo. Plaintiff at 32:7-33:14, 35:15-36:1.)

9.      Millard regularly hired work-release employees.  (Ex. 3, Aff. Terry Manson ¶ 5.)

10.     Plaintiff interviewed with Irvin Brown, a black employee of Millard. (Ex. 1, Depo. Plaintiff at 33:3-24.)

11.     Plaintiff began working for Millard at its 75th and Cornhusker Highway location in Lincoln, Nebraska, on March 29, 2004.  (Ex. 1, Depo. Plaintiff at 35:15-36:1; Ex. 4, Aff. Gayle Ream ¶ 5.)

12.     When Plaintiff began his employment with Millard, he was given a handbook which included the rules on employee conduct , as well as other work rules. (Ex. 1, Depo. Plaintiff at 36:13-16; Ex. 6.)

13.     Plaintiff was aware that it was a violation of work rules to threaten, intimidate, or coerce fellow employees, both on and off the premises of Defendant. (Ex. 1, Depo. Plaintiff at 36:17-20, 54:8-13; Ex. 6.)  Indeed, the plaintiff  was aware that if an employee made a "threat," the result "is strictly termination."  (Ex. 1, Depo. Plaintiff at 54:12-13.)

14.     Plaintiff signed the document at the outset of employment indicating that he had seen the handbook and understood its provisions.  (Ex. 1, Depo. Plaintiff at 36:21-37:16; Ex. 7.)

15.     After the closure of the 75th and Cornhusker Highway location in August 2004, Plaintiff began to work at the Waverly location. (Ex. 1, Depo. Plaintiff at 36:2-4, 37:17-19, 38:19-39:5; Ex. 4, Aff. Gayle Ream ¶ 5.)

16.     Plaintiff admitted that he had no problems during the time that he worked at the 75th and Cornhusker Highway location. (Ex. 1, Depo. Plaintiff at 37:17-22.)

17.     During the time that Plaintiff was employed with Millard, he was tasked with building pre-fabricated walls, with a job title of wall assembler. (Ex. 1, Depo. Plaintiff at 37:23-38:6.)

18.     Plaintiff agrees that he had no workplace problems until he moved to the Waverly location and that the alleged problems did not begin until just prior to his termination. (Ex. 1, Depo. Plaintiff at 39:6-40:16.)

19.     Plaintiff's only "problems" related to two white co-employees on the wall assembly line, specifically with Colt Rezek and Chad Meduna. (Ex. 1, Depo. Plaintiff at 40:24-42:9.)

20.     Plaintiff explained that Meduna and Rezek would assemble the wall studs, nail them together, put sheeting on the studs, tacking the corners, at which time the wall unit then would come to Plaintiff for his work. (Ex. 1, Depo. Plaintiff at 41:14-18.)

21.     Plaintiff would then take the assembled wall, cut out any doors or windows, and then staple the entire wall to the studs. (Ex. 1, Depo. Plaintiff at 41:18-20.)

22.     Plaintiff alleged that Rezek and Meduna, whose work station was located before the Plaintiff's on the assembly line, would sometimes leave 2x4 studs out of the wall and that when Plaintiff attempted to staple the sheeting to the wall, there was nothing to staple it into. Plaintiff claims that he needed to disassemble the unit and put in the missing 2x4 studs.  (Ex. 1, Depo. Plaintiff at 41:21-42:9.)

23.     When Plaintiff would have these problems with Meduna and Rezek, he indicated that he would go down the assembly line and talk to them about it.  (Ex. 1, Depo. Plaintiff at 44:16-24.)

24.     On December 20, 2005, Plaintiff claims that Rezek and Meduna again left studs out of the assembly which caused wall sections to back up on the line.  (Ex. 1, Depo. Plaintiff at 46:5-8.)

25.     As a result, Plaintiff admits that he and Rezek and Meduna "verbally argued."  (Ex. 1, Depo. Plaintiff at 46:14-19.)

26.     When Plaintiff was told by Rezek, "Man, just go do your job," Plaintiff claims that he replied, "I'm doing my job, but I don't want to have to do mine and yours too, because they're not paying me for that, but I want to make sure the job is did right."  (Ex. 1, Depo. Plaintiff at 47:20-24.)

27.     Plaintiff testified that he cannot recall anything else that either Rezek or Meduna said at the time.  (Ex. 1, Depo. Plaintiff at 47:25-49:5.)

28.     It was reported to management that Plaintiff stated, "This ain't no threat, this is a promise. I wouldn't mind going back to prison."  (Ex. 3, Aff. Terry Manson ¶ 11.)

29.     Plaintiff admits that he said to Rezek and Meduna, "This ain't no threat, this is a promise." (Ex. 1, Depo. Plaintiff at 51:14-15.)  However, the plaintiff stated at his deposition that he intended these words to mean "talking to the bosses and stuff and, and getting it . . . taken care of." (Ex. 1, Depo. Plaintiff at 51:17-20.)

30.     Rather than saying, "I wouldn't mind going back to prison," Plaintiff claims he said that he "didn't want to go back to prison." (Ex. 1, Depo. Plaintiff at 51:15-16.)

31.     As a result of this confrontation, Rezek and Plaintiff were initially suspended. (Ex. 1, Depo. Plaintiff at 52:6-16; Ex. 3, Aff. Terry Manson ¶ 10; Ex. 9; Ex. 10.)  Meduna was given a written reprimand. (Ex. 3, Aff. Terry Manson.)

32.     After a further investigation by Terry Manson, the production supervisor, which included "discussing the incident with the parties involved and other witnesses," it was determined that Plaintiff had actually made threats in the workplace and he was terminated as a result of those threats. (Ex. 3, Aff. Terry Manson ¶¶ 10 & 11.)  In particular, it was determined by Manson that Pickens had said, "This ain't no threat, this is a promise.  I wouldn't mind going back to prison" and "I will take you guys on." (Ex. 3, Aff. Terry Manson ¶ 11.)  The plaintiff denies making the "take you guys on" statement, but does admit making a statement that is somewhat similar, that is: "We can take care of this." (Ex. 1, Depo. Plaintiff at 49:6-10.)

33.     Rezek received a one-day suspension and a note to his file. (Ex. 3, Aff. Terry Manson ¶ 10; Ex. 10.)

34.     Suggesting that he was treated less favorably than Rezek because of race, the plaintiff gives an example that took place some weeks earlier where he claims that Rezek had been involved in an altercation with another employee and the men were "slinging 2-by-4's" at one another. (Ex. 1, Depo. Plaintiff at 60:14-61:11.)  However,

-6-

both Rezek and the other employee (Wiesen) have submitted affidavits stating that no lumber was swung and no threats were made, but both men were warned about having a loud argument.  (Ex. 13, Aff. Colt D. Rezek; Ex. 14, Aff. Seth Wiesen.)

35.     Millard provided the NEOC with an e-mail, dated February 24, 2006, prepared by the general manager of Millard, Jeff Taake, and transmitted to another Millard employee, setting forth the general manager's recollection of the investigation and the advice that he gave Manson.  (Pl's Ex. 3, E-Mail from Jeff Taake to Rob Sturgis bearing stamp ML-PICKENS (NEOC) 0008–0009.)[2]  Manson went to the general manager "seeking advice about how to handle [the] incident . . . ." (*Id.* at 0008.)  Taake told Manson "that we should terminate [the plaintiff] because of the direct threat he made to [Rezek]." (*Id.*)  Noting that Rezek had shouted during the incident, and because of "several other negative incidents" in the past, the general manager also suggested that Rezek be terminated.  (*Id.*)  However, the general manager allowed Manson to make his own decision, and "Terry didn't terminate [Rezek] but kept the suspension in place and talked with him about the seriousness of the matter and that another incident would result in termination . . . ." (*Id.*)  Although Taake thought both men should be fired, it is plain that he believed Pickens' behavior was the more egregious, that is, "I felt the seriousness of the threat/intimidation was such that we should dismiss [Pickens] immediately." (*Id.*)  The general manager said Millard was motivated to "head-off any problems that have the possibility of putting an employee in harms way." (*Id.* at 0009.)  He added that at "no time was race ever[] talked about . . . or even considered." (*Id.* at 0008.)

36.     Six to eight months before the incident in question, Pickens testified that Terry Manson ordered Pickens to come back to work while Pickens was seeking physical therapy for a finger injury.  (Ex. 1, Depo. Plaintiff at 70:21-71:18.)  When

---

[2]The plaintiff's summary judgment exhibits may be found in the plaintiff's evidence index, Filing 27.

Pickens refused to return to work without a release from the nurse, Pickens stated that Manson fired him. (Ex. 1, Depo. Plaintiff at 71:19-72:2.)  However, according to Pickens, he was allowed to return to work when another manager decided that Pickens could continue to work upon the completion of the proper paperwork.  (Ex. 1, Depo. Plaintiff at 72:3-73:12.)

*Facts Relating to Pay*

37.     Plaintiff began his employment at a wage rate of $9.00 per hour and, after receiving a number of raises, was making $9.90 per hour at the time of his termination.  (Ex. 1, Depo. Plaintiff at 38:7-18; Ex. 4, Aff. Gayle Ream ¶ 6.)

38.     At or near the time Plaintiff was terminated on December 22, 2005, there were four other employees who did a similar job as Plaintiff and were paid less than Plaintiff.  (Ex. 4, Aff. Gayle Ream ¶¶ 6 & 7.)

39.     Andrew Apa (white) was being paid $9.75 per hour on December 22, 2005.  (Ex. 4, Aff. Gayle Ream ¶ 7(a).)

40.     Dominic Apa (white) was being paid $9.50 per hour on December 22, 2005.  (Ex. 4, Aff. Gayle Ream ¶ 7(b).)

41.     Chad Meduna (white) was being paid $9.50 per hour on December 22, 2005.  (Ex. 4, Aff. Gayle Ream ¶ 7(c).)

42.     Colt Rezek (white) was being paid $9.00 per hour on December 22, 2005.  (Ex. 4, Aff. Gayle Ream ¶ 7(d).)

43.     Richard Morey (white) was being paid $9.00 per hour at the time of his

termination on November 10, 2005, approximately six (6) weeks before Plaintiff was terminated.  (Ex. 4, Aff. Gayle Ream ¶ 8.)

44.     When Plaintiff was terminated, there were other employees who did a similar job as Plaintiff and were paid more than Plaintiff.  (Ex. 4, Aff. Gayle Ream ¶ 9.)

45.     David Arrecis (Hispanic) was paid $10.00 per hour.  (Ex. 4, Aff. Gayle Ream ¶ 9(a).)

46.     Chris Witzki (white) was paid $10.00 per hour.  (Ex. 4, Aff. Gayle Ream ¶ 9(b).)

47.     Chris Leininger (white) was paid $10.15 per hour.  (Ex. 4, Aff. Gayle Ream ¶ 9(c).)

48.     While Pickens suggests that he was hired at a lower rate of pay than other comparable employees, when the payroll data upon which he relies is examined, it is apparent that there is no material difference in the wage rates for the comparable employees who were hired in 2004.  (*Compare* Richard Morey, Andrew Apa, and Chris Leininger described in Ex. 4, Aff. Gayle Ream ¶¶ 7-9 *with* Pl's Ex. 1, Attach. regarding Interrogatory No. 1 bearing stamp ML-PICKENS 00232 (contrast the data for Pickens ($9.00) with the data for Richard Morey ($9.00), Andrew Apa ($9.00), and Chris Leininger ($8.00)).)

49.     While Pickens claims that he did not receive comparable pay raises, when the payroll data upon which he relies is reviewed, the data does not support his assertion.  (*Compare* employees described in Ex. 4, Aff. Gayle Ream ¶¶ 7-9 *with* same employees described in Pl's Ex.1, Attach. regarding Interrogatory No. 1 bearing stamp ML-PICKENS 00232 (examine starting salaries, interim pay raises, and wages

paid on date of Pickens' termination).)  In particular, Pickens received a raise to $9.50 in June of 2004, and he received a raise to $9.90 a year later, in June of 2005. (Pl's Ex. 1, Attach. regarding Interrogatory No. 1 bearing stamp ML-PICKENS 00232.)

## II.  ANALYSIS

I first examine the plaintiff's claim that he was terminated because of his race. I then examine his claim that he was paid less because of his race.

### Termination

Where (as here) there is no direct evidence of discrimination, and the plaintiff claims he was fired because he was black, in order to present a prima facie case, he must adduce evidence showing that: (1) he is black; (2) prior to the firing, he was meeting the employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently.  *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (despite earlier racially insulting language by decision-maker ("Uncle Tom"), affirming summary judgment where black woman was ostensibly fired for, among other reasons, accessing pictures of nude men on her work computer; Court of Appeals assumed plaintiff made prima facie case, but concluded she could not demonstrate by preponderance of evidence that employer's asserted non-discriminatory rationale for termination was pretext).  "If a prima facie case is established, a burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for firing the plaintiff." *Id.* (internal punctuation & citation omitted).  "If the employer makes such a showing, the plaintiff must then demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination."  *Id.* at 935 (citation omitted).

Pickens has presented competent evidence to establish the first three factors of his prima facie case. The plaintiff has established that he is a member of a protected group; that prior to the incident in question, he was meeting the expectations of his employer; and that he was fired because of a dispute he had with two white coworkers.

However, I doubt that Pickens has presented competent evidence as to the fourth factor. In other words, I doubt whether he has established that "similarly situated" employees outside the protected class were treated differently. Unlike Pickens, the two white men who were involved with Pickens in the dispute and who were disciplined, but not fired, made no threats. Nonetheless, to give Pickens the benefit of the doubt, I assume that Millard's failure to fire some or all of the white people involved in the same argument is enough to force the company to explain itself. I stretch to make this assumption because Jeff Taake, the general manager, thought one of the white men should have been fired also.

Millard has presented competent evidence that it fired Pickens, and not the white men, because Pickens alone made threats. Pickens has failed to demonstrate by a preponderance of the evidence that this non-discriminatory rationale was a mere pretext for discrimination. In a case involving an argument between coworkers, the plaintiff does not prove pretext merely by showing that the black man was fired, but the white man received less harsh discipline, when the evidence also establishes that the black man made threats and the white man did not. *See*, *e.g.*, *Phillips v. Union Pacific R.R. Co.*, 216 F.3d 703, 706 (8th Cir. 2000) (fact that employer suspended African-American employee and required her to obtain psychiatric treatment but did not take same actions toward white employee was not evidence in Title VII action that employer's proffered nondiscriminatory reason for its actions, i.e., that African-American employee had threatened other employees, was pretextual; several individuals stated that African-American employee threatened to kill two coworkers, while evidence indicated that white employee merely had disruptive temper and often

-11-

used profanity); *Ward v. Procter & Gamble Paper Prod. Co.*, 111 F.3d 558, 560-61 (8th Cir.1997) (finding no disparate impact where plaintiff who slapped coworker's back was disciplined more severely than fellow employee who grabbed coworker's finger).

To the extent Pickens claims he made no threats, and that the white men are lying, that is not enough to prove pretext, particularly where the undisputed evidence shows that an investigation was made and the disputants and witnesses were interviewed. *See*, *e.g.*, *Phillips*, 216 F.3d at 706 (finding pretext was not proven by plaintiff's "unsubstantiated assertion that [the] statements [attributed to the plaintiff] are lies[,]" particularly where there "is no evidence that [the other employee] ever made death threats or otherwise acted in such a way as to cause [the employer] to fear that he might intentionally injure a co-worker").

As evidence of pretext, Pickens also points to the fact that the general manager thought one of the white men (Rezek) should be fired.   But, as the saying goes, the plaintiff must take the "bitter with the sweet."  It is clear that the general manager did not think that the behavior of Pickens and Rezek was comparable.  Indeed, the general manager thought the "seriousness of the threat/intimidation was such that we should dismiss [Pickens] immediately."  Furthermore, the general manager was emphatic that at "no time was race ever[] talked about . . . or even considered" when contemplating whether to fire Pickens.   Thus, while the *portion* of the statement regarding Rezek may be enough to make Pickens' prima facie case, the general manager's *entire* statement also disproves the plaintiff's claim of pretext.

Pickens also emphasizes that six to eight months before the incident in question, Terry Manson, the production supervisor who ultimately fired him, ordered him to come back to work while Pickens was seeking physical therapy for a finger injury.  When Pickens refused to return to work without a release from the nurse, Manson fired him.  Pickens implies that this evidence somehow suggests that

Manson's later decision to terminate him for uttering threats was racially motivated. However, previous disputes between the terminating-supervisor and the employee are not grounds for concluding that the stated reasons for termination are a pretext *unless* the earlier disputes show that race was at play. *See*, *e.g.*, *Hannoon v. Fawn Engineering Corp.*, 324 F.3d 1041, 1047 (8th Cir. 2003) (in suit alleging termination based upon race and national origin, earlier dispute between supervisor and employee about employee's body odor—a dispute that embarrassed the employee and caused him to complain—did not demonstrate any animus concerning race or national origin and thus was insufficient to prove that company's stated reasons for termination was pretext).

Here there is no reason to think that race was at play in the earlier dispute. After all, Pickens was reinstated. Moreover, he got a raise at about the same time as the earlier dispute was resolved (the summer of 2005). In addition, the earlier dispute—whether Pickens was required to return to work without a nurse's release—had nothing to do with race. Still further, the earlier dispute was unrelated to the problems on the production line that ultimately resulted in Pickens' termination. In short, the earlier dispute proves nothing.

Finally, Pickens claims that Rezek, one of the white men who was involved in the argument with him, had been involved in an earlier, physical altercation with another employee. Pickens claims that despite that fight, Rezek was not fired. He argues that this failure shows discriminatory animus. However, both Rezek and the other employee with whom Rezek was allegedly fighting have submitted affidavits denying Pickens' account of the incident. In particular, both men have sworn that there were no threats or physical violence. Given Millard's presentation of affidavits from *both* participants, Pickens' unsubstantiated claim of similarity is unavailing. Since Pickens has failed to show that the two arguments were comparable, no inference can be drawn from Millard's dissimilar handling of them.

In summary, assuming that Pickens has made a prima facie case, Millard has presented compelling evidence that its firing of Pickens was not motivated by race, but, rather, was motivated by an unwillingness to tolerate threats in a workforce populated with ex-convicts. In response, Pickens has failed to demonstrate by a preponderance of the evidence that Millard's refusal to tolerate his threats was a pretext for racial discrimination.

*Pay*

Because the plaintiff made no claim to the NEOC that he had been discriminated against regarding pay, the plaintiff concedes that he cannot assert a pay claim under Title VII. (*See* Filing 28, at CM/ECF p. 13.) The plaintiff can, however, proceed under 42 U.S.C. § 1983. Millard does not disagree. (*See* Filing 25, at CM/ECF p. 13.)

Pickens has failed to make a prima facie case of pay discrimination because the only thing he has shown is that some people who did similar jobs received higher pay, but other people who did similar jobs received lower pay. In fact, it appears that the plaintiff fell somewhere in the middle of the pay range. Simply put, the plaintiff has failed to show any meaningful statistical disparity, and he has no other evidence of pay discrimination. *See*, *e.g.*, *Morgan v. United Parcel Service of America, Inc.*, 380 F.3d 459, 469-470 (8th Cir. 2004) (in case brought in part under section 1981, affirming grant of summary judgment because plaintiff's expert's statistical analysis did not raise reasonable inference of discrimination in salaries paid black managers).

IT IS ORDERED that the defendant's motion for summary judgment (filing 24) is granted. Judgment will be entered by separate document.

October 31, 2007.                          BY THE COURT:
                                           s/ *Richard G. Kopf*
                                           United States District Judge

-14-